1  Kirk Pasich (SBN 94242)
   KPasich@PasichLLP.com
2  Anamay M. Carmel (SBN 298080)
   ACarmel@PasichLLP.com
3  PASICH LLP
   10880 Wilshire Boulevard, Suite 2000
4  Los Angeles, California 90024
   Telephone:  (424) 313-7860
5  Facsimile:   (424) 313-7890
6
7  Attorneys for Plaintiff
8
9              **UNITED STATES DISTRICT COURT**
10             **NORTHERN DISTRICT OF CALIFORNIA**
11
12 ANOTHER PLANET                          Case No.
   ENTERTAINMENT, LLC,
13
14          Plaintiff,                     **COMPLAINT FOR**
15      vs.                                1. BREACH OF CONTRACT;
16 VIGILANT INSURANCE COMPANY              2. TORTIOUS BREACH OF THE
                                           IMPLIED COVENANT OF GOOD
17          Defendants.                    FAITH AND FAIR DEALING;
18                                          3. FRAUD IN THE INDUCEMENT;
19                                          4. FRAUDULENT PROMISE MADE
20                                          WITHOUT INTENT TO PERFORM
21                                          5. FRAUDULENT
                                           CONCEALMENT;
22                                          6. NEGLIGENT
23                                          MISREPRESENTATION; AND
24                                          7. DECLARATORY RELIEF
25
26                                          **DEMAND FOR JURY TRIAL**
27
28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1      Plaintiff Another Planet Entertainment, LLC brings this action against

2 defendant Vigilant Insurance Company and alleges as follows:

3 **JURISDICTION AND VENUE**

4     1.    This Court has subject matter jurisdiction over this action pursuant to

5 28 U.S.C. section 1332 based on complete diversity of the parties and an amount in

6 controversy exceeding $75,000, exclusive of interest and costs.

7     2.    Venue is proper in this District pursuant to 28 U.S.C. section 1391.

8 **NATURE OF THE ACTION**

9     3.    Another Planet is an independent operator and exclusive promoter of

10 concerts, events, and festivals at the Greek Theatre at UC Berkeley, the Bill Graham

11 Civic Auditorium in San Francisco, the Fox Theater in Oakland, and the Lake Tahoe

12 Outdoor Arena at Harveys.  Vigilant is an insurer that sold Another Planet a broad,

13 "all-risk" property insurance policy protecting Another Planet against losses of

14 business income when there was, to quote the policy, "direct loss or damage to

15 property."

16     4.    As SARS-CoV-2 and COVID-19 began spreading around the United

17 States, Another Planet, like thousands of other businesses, was forced to suspend its

18 operations, close the concert venues, and cancel performances for almost all of 2020

19 and likely well into 2021.

20     5.    SARS-CoV-2, by its presence and threatened presence, damaged

21 Another Planet's property. SARS-CoV-2, COVID-19, and the orders of state and

22 local civil authorities and guidance from the Centers for Disease Control impaired

23 Another Planet's ability to use its insured locations for their intended uses and

24 purposes.  The closures also were necessary in order for Another Planet to mitigate

25 it damages.  As a result, Another Planet has suffered, and continues to suffer,

26 substantial financial losses, including lost profits, lost commissions, and lost

27 business opportunities.

28

6.     When Another Planet turned to Vigilant, Another Planet reasonably expected Vigilant to cover its losses.  However, instead of honoring its, Vigilant wrongfully denied coverage and refused to pay Another Planet for any portion of its losses.

7.     Put simply, there is no merit to Vigilant's refusal to pay Another Planet for its losses.  Broad "all risk" property insurance policies, such as the policy here, cover all losses not expressly excluded.  The policy here promised coverage for "direct physical loss or damage to property," a phrase that Vigilant and other insurers have known for decades extends to losses caused by the presence of a hazardous substance in the airspace inside a building or on property, and losses that result when the use or function of property is substantially impaired, even if the property has not been physically altered.

8.     In fact, as Vigilant has long known and California courts have recognized since at least 1962, even if a building or structure is not physically or structurally altered, it will be deemed, for insurance purposes, to have suffered a "direct physical loss or damage to property" if its function or purpose is substantially impaired.

9.     Vigilant has known for more than a decade that it and its insureds face a substantial risk of loss from viruses and pandemics and often has included an exclusion in its policies to limit or bar coverage for such losses.  Indeed, the insurance industry created a standard-form "virus or bacteria" exclusion in 2006 in an attempt to limit insurance for such losses.  However, in selling its policy to Another Planet, Vigilant decided not to include any such exclusion in the policy.  In fact, Vigilant did nothing in selling the policy to limit its liability for virus- or pandemic-associated risks.  Nor did Vigilant warn Another Planet that even though it did not include a virus or pandemic exclusion, it would interpret its policy as if it contained such an exclusion.

10.     By this lawsuit, Another Planet seeks damages to compensate it for Vigilant's contractual breaches, bad faith, and fraud.  It also seeks declaratory relief confirming that its losses are covered and will continue to be covered as they continue to be incurred.

## THE PARTIES

11.     Another Planet is a Delaware limited liability company whose members are trusts that are citizens of California.

12.     Another Planet is informed and believes, and on that basis alleges, that Vigilant is a New York corporation, with its principal place of business in Whitehouse Station, New Jersey.  At all times material hereto, Vigilant was licensed to transact, and did transact, business in California and the County of San Francisco.

13.     Another Planet is informed and believes, and on that basis alleges, that Vigilant is a wholly owned subsidiary of Federal Insurance Company, which is a wholly owned subsidiary of Chubb INA Holdings Inc., which is a subsidiary of Chubb Limited.  All are, and hold themselves out as being, members of the Chubb group of insurance companies (collectively, "Chubb").  Another Planet is informed and believes, and on that basis alleges, that Vigilant and the other Chubb companies are, and hold themselves out as being, extremely sophisticated and knowledgeable in insuring against property and business interruption losses and in investigating the risks they are insuring.  Another Planet is informed and believes, and on that basis alleges, that Vigilant and the other Chubb companies participate in a wide range of first-party property insurance programs and are, and hold themselves out as being, knowledgeable, experienced, and reliable, and willing to insure, and capable of insuring, substantial property and business interruption losses.

14.     Chubb makes various representations on behalf of its member companies, including Vigilant, on its collective website for its member companies, in advertising, and in public statements.  Another Planet is informed and believes, and on that basis alleges, that in making these statements, Chubb is speaking on

behalf of its member companies, including Vigilant, and is authorized to do so, such that Chubb's statements are the statements of its member companies, including Vigilant.

15.    Chubb poses this question on its website: "How is Chubb different?"  It answers as follows:

>    We don't just process claims, we make things right.
>
>    We hope you never need to file a claim with us.  But if you do, that's our opportunity to show you what "craftsmanship" means in service to you.  It means a quick response when you need it most.  It means Chubb people working with empathy, integrity and our legendary attention to detail to make you whole.  It means we honor the promises we've made to you.  Your loved ones, your employees, your home, your business reputation—these things matter.  These things are personal, for you and for us.
>
>    We're here to help.[1]

16.    Chubb also has represented, and represents, to the public:

>    If being treated fairly and paid quickly are important to your clients when they have a loss, you want Chubb. When your clients insure with Chubb, they're buying real insurance.[2]

17.    Chubb also represents:

>    The insurance claims process can sometimes be, well, a process.  At Chubb, it's different.  That's because we're not just in the insurance business, we're in the people

---

[1]   https://www.chubb.com/us-en/claims/claims-difference.aspx.
[2]   Chubb Ad, Business Insurance, at 11 (Apr. 4, 2008)

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1    business.  Our experienced claims specialists are relentless
2    about every detail in the most personal way possible.
3    Whether you have a business, homeowners or auto policy,
4    it's our policy to make your life easier. . . .  If a solution is
5    possible, we'll find a way to make it happen."[3]

6    18.    Chubb claims to specifically appreciate and understand that "[t]he risks
7  faced by entertainment industry companies can be unique and vary widely.  Chubb
8  offers customized coverage for property . . . to support your risk management
9  strategy."[4]

10              **THE COVID-19 PANDEMIC AND**
11              **ENSUING CIVIL AUTHORITY ORDERS**

12    19.    COVID-19 is a disease caused by a recently discovered virus known as
13  SARS-CoV-2.  The World Health Organization has named the virus and resulting
14  disease.  As the World Health Organization has stated:

15    Official names have been announced for the virus
16    responsible for COVID-19 (previously known as "2019
17    novel coronavirus") and the disease it causes.  The official
18    names are:

19    **Disease**
20    coronavirus disease
21    (COVID-19)
22    **Virus**
23    severe acute respiratory syndrome coronavirus 2
24    (SARS-CoV-2).[5]

25

26  ───────────────────
    [3]  https://www.chubb.com/us-en/claims/.
27  [4]  https://www.chubb.com/us-en/business-insurance/entertainment.aspx.
28  [5]  https://www.who.int/emergencies/diseases/novel-coronavirus-2019/technical-guidance/naming-the-coronavirus-disease-(covid-2019)-and-the-virus-that-causes-it.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

20.    The World Health Organization also has provided a straight-forward example of the distinction between a virus and a disease:

> Viruses, and the diseases they cause, often have different names.  For example, HIV is the virus that causes AIDS. People often know the name of a disease, such as measles, but not the name of the virus that causes it (rubeola). There are different processes, and purposes, for naming viruses and diseases.[6]

21.    The first reported cases of COVID-19 in humans were diagnosed in or around December 2019 in Wuhan, the capital city of the Hubei Province in China. Since then, SARS-CoV-2 and COVID-19 have spread throughout the world, prompting the World Health Organization to declare a global pandemic.

22.    As explained by the World Health Organization,

> People can catch COVID-19 from others who have the [SARS-CoV-2] virus. The disease spreads primarily from person to person through small droplets from the nose or mouth, which are expelled when a person with COVID-19 coughs, sneezes, or speaks. These droplets are relatively heavy, do not travel far and quickly sink to the ground. People can catch COVID-19 if they breathe in these droplets from a person infected with the virus. . . . These droplets can land on objects and surfaces around the person such as tables, doorknobs and handrails.  People can become infected by touching these objects or surfaces, then touching their eyes, nose or mouth.[7]

_____

[6] *Id.*

[7] World Health Organization, "How does COVID-19 spread?" (April 17, 2020), *available at*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1    23.    Aerosolized droplets exhaled by normal breathing can travel significant

2    distances and stay suspended in air for hours until gravity ultimately forces them to

3    the nearest surface.  Studies suggest that the SARS-CoV-2 virus can remain active

4    on inert surfaces for up to 28 days.[8]

5    24.    Since January 1, 2020, and as of the date of the filing of this Complaint,

6    there have been more than 40,000,000 confirmed cases of COVID-19 throughout

7    the world, more than 1,100,000 of which have resulted in deaths.[9]  There have been

8    more than 8,100,000 confirmed cases of COVID-19 in the United States, more than

9    218,000 of which have resulted in deaths.[10]  Moreover, due in part to the initial

10    absence of available tests, it is believed that the true number of coronavirus cases is

11    significantly higher than the reported numbers might suggest.[11]

12    25.    In March 2020, in response to the pandemic and the worldwide spread

13    of SARS-CoV-2, civil authorities throughout the United States began issuing "stay

14    home" and "shelter in place" quarantine orders and requiring the suspension of non-

15    essential business operations (collectively, "Closure Orders").

16    26.    In California, Governor Gavin Newsom issued Executive Order N-25-

17    20, ordering that: "All residents are to heed any orders and guidance of state and

18    local public health officials, including but not limited to the imposition of social

---

21    https://www.who.int/emergencies/diseases/novel-coronavirus-2019/question-and-answers-hub/q-a-detail/q-a-coronaviruses.

22

23    [8] *See, e.g.,* CNBC, *Virus that causes Covid-19 can survive for 28 days on common surfaces, research says* (Oct. 12, 2020), https://www.cnbc.com/2020/10/12/virus-that-causes-covid-19-can-survive-for-28-days-on-surfaces-research-says.html**;** Shane Riddell, Sarah Goldie, Andrew Hill, Debbie Eagles, & Trevor W. Drew, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7.

26    [9]  https://covid19.who.int.

27    [10]  https://covid19.who.int/region/amro/country/us.

28    [11]  Fiona P. Havers, Carrie Reed, Travis Lim, et. al, *Seroprevalence of Antibodies to SARS-CoV-2 in 10 Sites in the United States, March 23-May 12, 2020,* JAMA Internal Medicine (July 21, 2020), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2768834.

1   distancing measures, to control the spread of COVID-19."  Executive Order N-25-
2   20 took effect on March 12, 2020.

3          27.    On March 19, 2020, the State of California issued an Order of the State
4   Public Health Officer, which required all individuals living in the state to stay at
5   home or at their place of residence "except as needed to maintain operations of the
6   federal critical infrastructure sectors."  On that same date, California Governor
7   Newsom issued Executive Order N-33-20, expressly requiring California residents
8   to follow the March 19, 2020, Order of the State Public Health Officer, and
9   incorporating by reference California Government Code 8665, which provides that
10  "[a]ny person . . .  who refuses or willfully neglects to obey any lawful order . . .
11  issued as provided in this chapter, shall be guilty of a misdemeanor and, upon
12  conviction thereof, shall be punishable by a fine of not to exceed one thousand
13  dollars ($1,000) or by imprisonment for not to exceed six months or by both such
14  fine and imprisonment."

15         28.    Officials of Alameda and San Francisco Counties subsequently issued
16  similar orders in response to the rapid spread of SARS-CoV-2 and the resulting
17  damage to individuals and property that it causes.

18         29.    Similarly, in Nevada, Governor Steve Sisolak issued Declaration of
19  Emergency Directive 003, ordering that all non-essential business close.  In
20  conjunction with that order, the Nevada Health Response issued Covid-19 Risk
21  Mitigation Initiative further ordering that "all Nevadans stay home."  These orders
22  took effect on March 17, 2020.

23         30.    Chubb has publicly commented on the pandemic and made many
24  representations about how it would respond to claims by its insureds under Chubb
25  policies.  For example, Chubb proclaims as follows on its website:

26              Our hearts go out to those affected by the COVID-19
27              pandemic.  We have been – and stand ready to continue –

supporting our clients, distribution partners and communities.[12]

31.    Chubb also states:

**We're here for you —**

**Financially –** Chubb has the financial strength and resources to support our policies and the financial capacity to pay covered claims even in these uncertain times.

**Operationally –** All of our claims networks and supporting systems are fully operational and all Chubb employees can access these systems from home.

**Resourcefully –** We know we will face unanticipated challenges, but Chubb is committed to providing you with the high level of claims service and responsiveness that you expect, and we will do what is feasible to ensure that continues, all in compliance with the fast-changing laws, rules and regulations. We plan for the unexpected and remain agile and adaptable; including using alternative means of adjusting claims as needed and feasible.

**While we are in a time of unprecedented uncertainty, Chubb is well prepared and will be there for you, as always.**[13]

32.    Chubb further states:

**Doing our part**

Chubb takes pride in our continuing commitment to our clients.[14]

---

[12]  https://www.chubb.com/microsites/covid19-resource-center/index.aspx.

[13]  https://www.chubb.com/microsites/covid19-resource-center/claims.aspx.

[14]  https://www.chubb.com/microsites/covid19-resournce-center/index.aspx.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

33.     Chubb echoed these sentiments in a news release in April 2020, stating:

> "We are committed to supporting people, business and communities most impacted by this global crisis," said Evan G. Greenberg, Chairman and Chief Executive Officer.[15]

## WHAT VIGILANT KNEW BEFORE IT SOLD THE POLICY

34.     Vigilant and other insurers were repeatedly warned over the years of the potential impact of pandemics.  In fact, there were many publicly available reports about the risks of pandemics and what insurers should do—in the months and years before the outbreak of the COVID-19 pandemic.  For example, one article noted in March 2018:

> Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community.  In addition, indirect losses would be severe, most notably on the asset side of the balance sheet.[16]

35.     One insurance industry repository shows the proverbial "tip of the iceberg" about how much information was available to Vigilant and other insurers regarding the risk of pandemics.  The Insurance Library Association of Boston, founded in 1887, describes itself as "the leading resource for and provider of literature, information services, and quality professional education for the insurance industry and related interests."[17]  The Association states on its website:

---

[15] https://news.na.chubb.com/2020-04-05-Chubb-Commits-10-Million-to-Pandemic-Relief-Efforts-Globally-Company-Pledges-No-Covid-19-Layoffs.

[16] "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/.

[17] http://insurancelibrary.org/about-us/.

11

1    The past 20 years [have] seen the rise of a number of
2    pandemics. Slate recently published an article on what has
3    been learned about treating them in that time. We thought
4    it might be apt for us to take a look back and see what the
5    insurance industry has learned as well.[18]

6    36.    The Association lists more than 20 articles, reports, and white papers
7    available to insurers from early 2007 through 2018. One white paper warned in
8    2009 of a pandemic's consequences to the insurance industry:

9    It is highly unlikely that the insurance industry would have
10    the financial reserves to meet the worldwide claims arising
11    out of a pandemic of this size.[19]

12    37.    Thus, Vigilant has known, or should have known, for decades that its
13    policies probably would be called upon to pay hundreds of millions of dollars or
14    more to its insureds.

15    38.    Vigilant also has known, or should have known, for decades that its
16    policies could be held to cover losses from the presence of a hazardous substance,
17    such a virus inside buildings or because a building could not be used for its intended
18    purposes or function. As Vigilant has known, or should have known, for decades
19    many courts have held that the presence of a hazardous substance in property,
20    including the airspace inside buildings, constitutes property damage and that there
21    may be "direct physical loss" to property even if the property is not physically
22    damaged. As Vigilant has known, or should have known, the many decisions
23    include the following:

24
25
26
27
---

[18] http://insurancelibrary.org/pandemics-and-insurance/.

[19] Allan Manning, *White Paper on Infectious Disease Cover* (updated 2009), http://www.lmigroup.com/Documents/Articles/White%20Paper%20on%20Infectious%20Disease%20Cover.pdf?mc_cid=f0cee24803&mc_eid=41023ebc2c.

PASICH

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

- *AIU Insurance Co. v. Superior Court*, 51 Cal. 3d 807, 842 (1990): "contamination of the environment satisfies" the requirement of property damage.

- *Aetna Casualty & Surety Co. v. Pintlar Co.,* 1948 F.2d 1507, 1514 (9th Cir. 1981):  "The insurers further concede that contamination of the soil and water by hazardous substances constitutes injury to property . . . .  And an ordinary person would find that the environmental contamination alleged . . . falls within the plain mean of 'property damage' as that term is used in policies."

- *Arbeiter v. Cambridge Mut. Fire Ins. Co.*, 1996 WL 1250616, at *2 (Mass. Super. Ct. Mar. 15, 1996):  presence of oil fumes in building constituted "physical loss" to building.

- *Essex Ins. Co. v. BloomSouth Flooring Corp.*, 562 F.2d 399, 406 (1st Cir. 2009):  odor from carpet and adhesive "can constitute physical injury to property."

- *Farmers Ins. Co. v. Trutanich,* 123 Or. App. 6, 9-11 (1993):  "[T]he odor produced by the methamphetamine lab had infiltrated the house. The cost of removing the odor is a direct physical loss."

- *Gregory Packaging, Inc. v. Travelers Prop. Cas. Co.,* 2014 WL 6675934 (D.N.J. Nov. 25, 2014):  closure of facility because of accidentally released ammonia; while "structural alteration provides the most obvious sign of physical damage, . . . property can sustain physical loss or damage without experiencing structural alteration."

- *Matzner v. Seacoast Ins. Co.*, 1998 WL 566658 (Mass. Super. Ct. Aug. 12, 1998):  building with unsafe levels of carbon monoxide sustained direct physical loss.

- *Mellin v. N. Sec. Ins. Co*., 167 N.H. 544, 550-51 (2015): cat urine odor inside condominium constitutes direct physical loss; "'physical loss'

13

1  need not be read to include only tangible changes to the property that

2  can be seen or touched, but can also encompass changes that are

3  perceived by the sense of smell.". . . a property policy insures "physical

4  loss changes to the insured property, but also changes that are

5  perceived by a sense of smell" and 'may exist in the absence of

6  structural damage to the insured property.'"

7   •   *Oregon Shakespeare Festival Ass'n v. Great Am. Ins. Co.*, 2016 WL

8      3267247, at *9 (D. Ore. June 7, 2016):  "smoke infiltration in theatre

9      caused direct property loss or damage by causing the property to be

10     uninhabitable and unusable for its intended purpose."

11  •   *Port Authority of New York & New Jersey v. Affiliated FM Ins. Co.*,

12     311 F.3d 226, 236 (3d Cir. 2002):  property sustained a direct physical

13     loss because it was rendered uninhabitable by the presence of asbestos

14     fibers.

15  •   *Sentinel Mgt. Co. v. Aetna Cas. & Sur. Co.*, 1999 WL 540466, at *7

16     (Minn. Ct. App. July 27, 1999):  "If rental property is contaminated by

17     asbestos fibers and presents a health hazard to tenants, its function is

18     seriously impaired."

19  •   *Sentinel Mgt. Co. v. New Hampshire Ins. Co.*, 563 N.W.2d 296, 300

20     (Minn. Ct. App. 1997):  "Although asbestos contamination does not

21     result in tangible injury to the physical structure of a building, a

22     building's function may be seriously impaired or destroyed and the

23     property rendered useless by the presence of contaminants. . . .  Under

24     these circumstances, we must conclude that contamination by asbestos

25     may constitute a direct, physical loss to property under an all-risk

26     insurance policy."

27

28

PASICH

- *Western Fire Ins. Co. v. First Presbyterian Church,* 165 Colo. 34, 39-40 (1968):  direct physical loss when gasoline contaminated church building making it dangerous to use.

39.   Because Vigilant long has been licensed to sell insurance to California insureds, it has known, or should have known, that a California Court of Appeal addressed in 1962—58 years ago—the question of whether a property insurance policy could cover loss or damage to a structure that had no physical damage or alteration.  In *Hughes v. Potomac Insurance Co.,* 199 Cal. App. 2d 239 (1962), the insureds' house had been left partially overhanging a cliff after landslide.  The house suffered no physical damage.  However, the court rejected the insurer's argument that there was no "direct physical loss."  The court explained why, and what an insurer should do if it did not want to cover such losses:

> Despite the fact that a 'dwelling building' might be rendered completely useless to its owners, [the insurer] would deny that any loss or damage had occurred unless some tangible injury to the physical structure itself could be detected.  Common sense requires that a policy should not be so interpreted in the absence of a provision specifically limiting coverage in this manner.  [The insureds] correctly point out that a 'dwelling' or 'dwelling building' connotes a place fit for occupancy, a safe place in which to dwell or live.  It goes without question that [the insureds'] 'dwelling building' suffered real and severe damage when the soil beneath it slid away and left it overhanging a 30-foot cliff.  Until such damage was repaired and the land beneath the building stabilized, the structure could scarcely be considered a 'dwelling

building' in the sense that rational persons would be content to reside there.[20]

40.     Given the potential liability that insurers, including Vigilant, faced under their policies for losses from pandemics, shortly after the outbreak of SARS in 2003, the insurance industry undertook to draft exclusions applicable to losses from viruses and bacteria.  In 2006, the Insurance Services Office ("ISO"), the insurance industry's drafting organization, considered the need to draft an exclusion that would bar coverage for losses caused by a virus.[21]

41.     On July 6, 2006, ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to viruses and bacteria.[22]  In that circular, it noted that examples of "viral and bacterial contaminants are rotavirus, SARS, [and] influenza," observing, "The universe of disease-causing organisms is always in evolution."[23]  ISO recognized that viruses could cause property damage, stating:

> Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property.  When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior

---

[20] *Id.* at 248-49.

[21] "ISO is a non-profit trade association that provides rating, statistical, and actuarial policy forms and related drafting services to approximately 3,000 nationwide property or casualty insurers. Policy forms developed by ISO are approved by its constituent insurance carriers and then submitted to state agencies for review.  Most carriers use the basic ISO forms, at least as the starting point for their general liability policies."  *Montrose Chem. Corp. v. Admiral Ins. Co.,* 10 Cal. 4th 645,671 n.13 (1995).

[22] *See ISO* Circular, "New Endorsements Filed to Address Exclusion of Loss Due to Virus or Bacteria," (July 6, 2006), https://www.propertyinsurancecoveragelaw.com/files/2020/03/ISO-Circular-LI-CF-2006-175-Virus.pdf.

[23] *Id.*

**COMPLAINT AND DEMAND FOR JURY TRIAL**

building surfaces), and business interruption (time element) losses.[24]

42.     In fact, ISO expressly warned that "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent."[25]  Therefore, ISO introduced a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).

43.     Thus, Vigilant and other insurers have had a "virus or bacteria" exclusion since 2006 that is approved for use throughout the United States.  As one recent article succinctly stated, "Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage."[26]

44.     However, Another Planet is informed and believes, and on that basis alleges, that even though they knew they could be liable for losses from viruses and pandemics if they did not include an appropriate exclusion in their policies, Vigilant and other members of the Chubb group of insurers still sold many policies (including the policy at issue here) without including such an exclusion.  Therefore, it should be no surprise to Vigilant that it would be obligated to pay for losses when it did not include such an exclusion.  In fact, in reporting on the financial condition and performance of Vigilant and the other Chubb companies, Chubb Limited warned investors of the potential negative impact on their financial results and condition from this exposure—and did so well before Vigilant sold the policy to

---

[24] *Id.*

[25] *Id.*

[26] Todd Frankel, "Insurers knew the damage a viral pandemic could wreak on businesses.  So they excluded coverage," *Washington Post* (April 2, 2020).  This statement might be true for many policies, but it is not true as to the policy here—Vigilant did not exclude coverage for viruses and pandemics.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1  Another Planet.  For example, Chubb Limited stated the following warning in its

2  2017 Annual Report:

> **Our results of operations or financial condition could be adversely affected by the occurrence of natural and man-made disasters.**
>
> We have substantial exposure to losses resulting from natural disasters . . .  such as . . . catastrophic events, including pandemics. This could impact a variety of our businesses, including our commercial and     personal lines . . . . Catastrophes can be caused by various events, including . . .  natural or man-made disasters, including a global or other wide-impact pandemic . . . .   The occurrence of claims from catastrophic events could result in substantial volatility in our results of operations or financial condition for any fiscal quarter or year. The historical incidence for events such as . . . pandemics . . . is infrequent and may not be representative of contemporary exposures and risks. . . . [T]he occurrence of one or more catastrophic events could have an adverse effect on our results of operations and financial condition.[27]

## THE VIGILANT POLICY

45.    Vigilant sold Another Planet a Customarq Series Entertainment Insurance Program, which includes a Property Insurance Section and a Liability Insurance Section (the "Policy").  A true and correct copy of the Policy is attached

---

[27]  Chubb Limited, 2017 Annual Report, at 19, https://s1.q4cdn.com/677769242/files/doc_financials/2018/AGM/Chubb_Limited_2017_Annual_Report.pdf.

18

COMPLAINT AND DEMAND FOR JURY TRIAL

1   hereto as Exhibit A and incorporated herein by reference.  The Policy was in effect

2   from May 1, 2019, to May 1, 2020.  Before selling the Policy to Another Planet,

3   Vigilant engaged in, or had reasonable opportunities to engage in, an extensive

4   underwriting investigation and became familiar and knowledgeable regarding the

5   nature and scope of Another Planet's business and the nature of the risks that it was

6   insuring against.

7       46.     The Property Insurance Section of the Policy is an "all risk" property

8   insurance policy—that is, a policy that covers all risks of physical loss or damage

9   except those plainly, clearly, conspicuously, and expressly excluded.  Unlike

10  "enumerated perils" property insurance policies, which cover only certain causes of

11  loss, "all risk" property insurance policies provide broad coverage for

12  unprecedented and unanticipated risks of loss.

13      47.     The Policy is comprised of a number of forms and endorsements that

14  define the scope of coverage.  Like most commercial property insurance policies,

15  the Policy insures not only against physical loss or damage to covered property, but

16  also for resulting economic and financial losses.  This coverage is referred to in the

17  Policy as "Business Income With Extra Expense" coverage.  *See* Ex. A, Property

18  Insurance – Business Income With Extra Expense.

19      48.     The Policy's Business Income With Extra Expense coverage is

20  designed, understood, stated, and intended to cover Another Planet for economic

21  losses, including losses from the interruption and/or reduction of its business,

22  suffered as a result of "direct physical loss or damage" to covered property that is

23  "caused by or result[s] from a **covered peril**."  Vigilant elected not to define or

24  explain the phrase "direct physical loss or damage."

25      49.     Under this coverage, Vigilant agreed to pay for Another Planet's actual

26  loss of Business Income sustained due to the "impairment" of Another Planet's

27  operations.  *Id.*

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

50.    The "Extra Expense" portion of this coverage grant is designed, understood, stated, and intended to cover Another Planet for losses from "the actual or potential impairment" of its "**operations**." *Id.*

51.    Within the Business Income With Extra Expense coverage, the Policy provides an "Additional Coverage" for "Civil Authority," which obligates Vigilant to pay Another Planet's "**business income** loss" and "**extra expense**" "incur[red] due to the actual impairment of [its] **operations**, directly caused by the prohibition of access to: [its] premises; or a **dependent business premises**, by a civil authority." *Id.*  The "prohibition of access by a civil authority must be the direct result of direct physical loss or damage to property away from such premises or such **dependent business premises** by a **covered peril**, provided such property is within: one mile . . . from such premises or **dependent business premises** . . . ." *Id.*

52.    The Policy also provides an "Additional Coverage" for "Dependent Business Premises," which obligates Vigilant to pay Another Planet's "**business income** loss . . . due to the actual impairment of [its] **operations**" and its "**extra expense** . . . due to the actual or potential impairment of [its] **operations**." *Id.*  The "actual or potential impairment of **operations** must be caused by or result from direct physical loss or damage by a **covered peril** to **property** . . . at a **dependent business premises**." *Id.*

53.    The Policy defines "**dependent business premises**" as "premises operated by others on whom [Another Planet] depend[s] to: deliver materials or services to you or to others for your account (contributing premises); [and] accept your products or services (recipient premises) . . . ." *Id.*

54.    Vigilant's knowledge of the ability of a virus to cause property damage is further evidenced by its inclusion of a virus-related exclusion in the liability portion of the package policy that it sold to Another Planet.  *See* Ex. A, Exclusion End., Biological Agents.  Even though the liability portion of the Policy covers "damages that the insured becomes legally obligated to pay by reason of liability:

PASICH

1   imposed by law; or assumed in an insured contract; for . . . property damage caused

2   by an occurrence to which this coverage applies," it excludes coverage for

3   "damages, loss, cost or expense arising out of the actual, alleged or threatened

4   contaminative, pathogenic, toxic or other hazardous properties of **biological**

5   **agents**."  *Id.*  "**Biological Agents**" is defined to include "viruses or other pathogens

6   (whether or not a microorganism)."  *Id.*

7       55.    Despite its awareness of the massive losses that its insureds, including

8   Another Planet, could face from a virus-related pandemic, Vigilant decided to sell

9   the Policy without any exclusion for losses caused by or resulting from the viruses,

10  communicable diseases, or pandemics.  Because losses caused by or resulting from

11  viruses, communicable diseases, and pandemics are not expressly excluded under

12  the Policies, they are, as a matter of law and pursuant to decades of insurance

13  industry custom and practice, Covered Perils.

14  ### VIGILANT'S WRONGFUL CONDUCT

15      56.    Another Planet has sustained covered Business Income and Extra

16  Expense losses as defined in the Policy.  These Business Income and Extra Expense

17  losses were sustained due to the "impairment" of Another Planet's business

18  operations as a result of "direct physical loss or damage" to insured premises and

19  "dependent business premises."  These Business Income and Extra Expense losses

20  were also caused by the state, municipal, and other civil authority orders issued

21  throughout the United States, each of which were issued in response to the actual

22  presence of the virus and constitute a "prohibition of access by a civil authority" as

23  that phrase is used in the Policies.

24      57.    The Closure Orders were issued due to the presence of the SARS-CoV-

25  2 virus and the desire to avoid the spread of the virus and the disease that it causes,

26  COVID-19.  The Closure Orders further prohibited Another Planet's access to its

27  insured premises.  Because the SARS-CoV-2 virus adheres to surfaces of property

28  for almost a month and can linger in the air in buildings for several hours, the

21

1    presence of the SARS-CoV-2 virus on or around property amounts to "direct

2    physical loss or damage to property" as that phrase is used in the Policies.  In fact,

3    given the manner in which SARS-CoV-2 lingers in the air and on surfaces, and its

4    manner of transmission, and the desire to "flatten the curve," Another Planet's

5    premises and the premises upon which it depends were not capable of fulfilling their

6    essential functions. Accordingly, the state, municipal, and other civil authority

7    orders issued in response to "direct physical loss or damage" that SARS-CoV

8    caused substantially impaired the premises.  They also amount to the "prohibition of

9    access by a civil authority" that is "the direct result of direct physical loss or damage

10   to property away from such premises" as required to trigger Civil Authority

11   coverage under the Policy.

12          58.    SARS-CoV-2 particles attached to and damaged Another Planet's

13   premises that were insured under the Policy, as well as the surrounding vicinity,

14   rendering its premises unsafe and unusable, and resulted in direct physical loss or

15   property damage.  As a result, all events scheduled for Another Planet's venues

16   were cancelled, including scheduled concerts by Bob Dylan, John Legend, Sturgill

17   Simpson,  Wilco, Phish, The Black Keys, Nelly, Kraftwerk and Kenny Chesney,

18   among many others.  At this time, it appears that Another Planet will not be able to

19   access or otherwise operate its venues as it ordinarily would until sometime in 2021.

20          59.    By suspending business operations, Another Planet also reduced the

21   likelihood of further losses, including the ability to reopen at any point in the future.

22   Had Another Planet not done so, the potential for a complete loss was imminent.

23   The viability of the intended use of the premises entirely depends on the ability of

24   Another Planet's customers to know and believe that attending an event there is

25   safe.  Had Another Planet not acted in accordance with the Closure Orders, that

26   knowledge would have been seriously called into question.  Therefore, by closing in

27   response to the presence of SARS-CoV-2 on the premises and the Closure orders,

28   Another Planet preserved the functional viability of the insured premises.

PASICH

60.    The suspension of business at each insured venue as a result of the property damage caused by the presence of SARS-CoV-2 and the related Closure Orders resulted in significant losses to Another Planet that will exceed the Policy's $23,908,822 limit, and which continue to rise.

61.    Although Another Planet has sustained Business Income and Extra Expense losses falling squarely with the Policy's coverage, Vigilant failed and refused to acknowledge coverage for Another Planet's losses.

62.    Vigilant wrongfully denied Another Planet's claim months after it had decided, in conjunction with a blanket position taken in March 2020 by all Chubb insurers, that it would deny coverage under property policies for business income losses associated with SARS-CoV-2, COVID-19, and the Closure Orders.  In fact, the Chubb website contains a "Final – March 26, 2020" notice stating in part:

> Business interruption insurance generally covers losses to your business' income that result from disruption of your business. The disruption must be caused by physical loss or damage to your property by a "covered peril." The presence of an infectious agent or communicable disease at a location where there is covered property generally will not mean that property has suffered "physical loss or damage" under your policy. Generally, "physical loss or damage" means that the physical structure or physical characteristics of the property have been altered by a "covered peril". Loss of use, or diminished value of property that has not been physically altered will not be considered "physical loss or damage."[28]

---

[28] https://www.chubb.com/microsites/covid19-resource-center/_assets/pdf/covid-commercial-property-policyholder-notice-4-1-2020.pdf.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

63.     Vigilant also took the same position through its trade association, the American Property Casualty Insurance Association in a letter to the United States House of Representatives Committee on Business. The Association wrote on March 18, 2020, stating: "Business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19." *See* March 18, 2020, Letter, American Property Casualty Insurance Association, The Council of Insurance Agents & Brokers, Big Independent Insurance Agents & Brokers of America, and National Association of Mutual Insurance Companies to House Committee on Small Business.  A true and correct copy of this letter is attached hereto as Exhibit B and incorporated herein by reference.  Thus, it is clear that before Vigilant did any meaningful investigation into Another Planet's claim (if it did any investigation at all), it already had decided that it would not pay Another Planet for its losses under the Policy.

64.     Vigilant was required under California law and insurance industry custom and practice to conduct a thorough investigation of facts that might support Another Planet's claim before denying coverage.  Another Planet is informed and believes, and on that basis alleges, that Vigilant did not conduct the required investigation before denying Another Planet's claim.  With either a perfunctory or no meaningful investigation into Another Planet's losses, Vigilant denied Another Planet's claim, incorrectly asserting that its losses were not caused by or the result of direct physical loss or damage or due to the prohibition of access by a civil authority.  Vigilant took this position despite the Closure Orders issued in response to the presence of SARS-CoV-2 in California and Nevada, and notwithstanding the fact that the presence of SARS-CoV-2 on or around the insured property amounts to "direct physical loss or damage" to property under the governing rules of insurance policy interpretation and California law.

65.     Vigilant denied coverage even though it knew, or should have known, that by selling its Policy without a virus exclusion or a pandemic exclusion, Another

Planet reasonably would understand and expect that the Policy covered losses associated with viruses and pandemics.  Vigilant knew, or should have known, that it should not deny coverage when the Policy did not contain such an exclusion, when its insured reasonably could expect coverage for loses associated with viruses and pandemics, and when any ambiguity in its Policy would be resolved in favor of any reasonable interpretation held by Another Planet.

66.     To the extent not waived or otherwise excused, Another Planet complied with provisions contained in the Policy.  Therefore, Another Planet is entitled to all benefits of insurance provided by the Policy.

## FIRST CAUSE OF ACTION

### *For Breach of Contract*

67.     Another Planet realleges and incorporates by reference paragraphs 1 through 66 above.

68.     Vigilant breached its duties under the Policy by adopting the position that Another Planet sustained no "physical loss or damage," by denying coverage for Another Planet's losses, and by otherwise acting as alleged above.

69.     As a direct and proximate result of Vigilant's breaches, Another Planet has sustained, and continues to sustain, damages, plus interest, for which Vigilant is liable. The amount of Another Planet's damages is not yet precisely known but will be established according to proof.  Another Planet will seek leave to amend this Complaint to more precisely allege the amount of its damages when the amount is more precisely known.

## SECOND CAUSE OF ACTION

### *For Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing*

70.     Another Planet realleges and incorporates by reference paragraphs 1 through 66 and 68 above.

71.     Implied in the Policy was a covenant that Vigilant would act in good faith and deal fairly with Another Planet, that Vigilant would do nothing to interfere

1  with right of Another Planet to receive benefits due under the Policy, and that
2  Vigilant would give at least the same level of consideration to the interests of
3  Another Planet as it gave to its own interests.

4      72.    Vigilant also had a duty under the Policy, the law, and insurance
5  industry custom, practice, and standards to conduct a prompt and thorough
6  investigation, including as to all bases that might support Another Planet's claims
7  for insurance coverage, before reserving rights to deny or denying, coverage.

8      73.    Instead of complying with its duties, Vigilant acted in bad faith by,
9  among other things:

10         a.    failing to conduct a full and thorough investigation of Another
11               Planet's claim for insurance coverage and asserting grounds for
12               denying coverage without conducting such investigation;

13         b.    wrongfully and unreasonably asserting grounds for denying
14               coverage that Vigilant knew, or should have known, are not
15               supported by, and in fact are contrary to, the terms of the Policy,
16               the law, insurance industry custom and practice, and the facts;

17         c.    failing to fully inquire into the bases that might support coverage
18               for Another Planet's claim;

19         d.    failing to conduct an adequate investigation of the losses suffered
20               by Another Planet, and asserting grounds for disputing coverage
21               based on its inadequate investigation;

22         e.    creating and implementing a course of action to automatically
23               deny coverage for all business interruption claims relating to
24               SARS-CoV-2, Covid-19, and subsequent events;

25         f.    unreasonably failing and refusing to honor its promises and
26               representations in the Policy it issued to Another Planet;

27         g.    giving greater consideration to its own interests than it gave to
28               the interests of Another Planet; and

PASICH

1        h.     otherwise acting as alleged above.

2      74.     In breach of the implied covenant of good faith and fair dealing, Vigilant did the things and committed the acts alleged above for the purpose of consciously withholding from Another Planet the rights and benefits to which it is and are entitled under the Policy.

75.     Vigilant's actions are inconsistent with Another Planet's reasonable expectations, are contrary to established industry custom and practice, are contrary to legal requirements, are contrary to the express terms of the Policy, and constitute bad faith.

76.     As a direct and proximate result of Vigilant's breaches, Another Planet has sustained, and continues to sustain, damages in an amount in excess of this Court's jurisdictional limits, plus interest, for which Vigilant is liable.   Also, pursuant to *Brandt v. Superior Court*, 37 Cal. 3d 813 (1985), Another Planet is entitled to recover all attorneys' fees it reasonably incurred, and continues to incur, in the efforts to obtain the benefits due under the Policy that Vigilant has withheld, and is withholding, in bad faith.  The amount of Another Planet's damages is not yet precisely known but will be established according to proof.  Another Planet will seek leave to amend this Complaint to more precisely allege the amount of its damages when the amount is more precisely known.

77.     Another Planet is informed and believes, and on that basis alleges, that Vigilant, acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of its business, performed, authorized, or ratified the bad faith conduct alleged above.

78.     Vigilant's conduct is despicable and has been done with a conscious disregard of the rights of Another Planet, constituting oppression, fraud, or malice. Vigilant engaged in a series of acts designed to deny Another Planet the benefits due under the Policy.  Specifically, Vigilant, by acting as alleged above, in light of

27

1    information, facts, and relevant law to the contrary, consciously disregarded

2    Another Planet's respective rights and forced Another Planet to incur substantial

3    financial losses, thereby inflicting substantial financial damage on Another Planet.

4    Vigilant ignored Another Planet's interests and concerns with the requisite intent to

5    injure within the meaning of California Civil Code section 3294.  Therefore,

6    Another Planet is entitled to recover punitive damages from Vigilant in an amount

7    sufficient to punish and make an example of Vigilant and to deter similar conduct in

8    the future.

9                              **THIRD CAUSE OF ACTION**

10                              ***Fraud in the Inducement***

11          79.     Another Planet realleges and incorporates by reference herein each

12    allegation contained in 1 through 66, 68, and 71 through 75 above.

13          80.     Another Planet is informed and believes, and on that basis alleges, that

14    when Vigilant sold the Policy to Another Planet, it knew that Another Planet could

15    suffer substantial business income and other economic losses from a virus or

16    pandemic and that Another Planet sought and expected the broadest coverage

17    possible.

18          81.     In negotiating and selling the Policy, Vigilant expressly and impliedly

19    represented to Another Planet that the Policy would cover all forms of property loss

20    and damage unless expressly excluded, including by issuing an April 29, 2019

21    binder that promised broad coverage without any restrictions or exclusions for virus

22    or pandemic losses, and selling the Policy with the same terms.

23          82.     Another Planet is informed and believes, and on that basis alleges, that

24    if Vigilant's position that it has no obligation to pay for property damage or loss

25    caused by a virus or pandemic is true, then Vigilant misrepresented the insurance it

26    planned and promised to provide to Another Planet and the true nature and the

27    characteristics of the Policy.

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

83.     At no time during the discussions leading to Another Planet's purchase of the Policy did any representative of Vigilant ever disclose that despite these clear representations, Vigilant believed and later would contend that it would not cover property loss or damage caused by a virus or pandemic, which was not excluded from coverage.

84.     Another Planet is informed and believes, and on that basis alleges, that at the time that Vigilant made these promises and representations, Vigilant did so intentionally knowing that they were false.  Vigilant intended Another Planet to rely upon them in agreeing to purchase the Policy.  Vigilant induced Another Planet to purchase the Policy based on Vigilant's representation that the Policy was, in fact, an "all risk" policy that would cover all losses not expressly excluded, including losses caused by viruses and pandemics.

85.     At the time Vigilant made these representations and promises, Another Planet was ignorant of Vigilant's secret plan and intention not to perform and the falsity of the representations.  Another Planet could not, in the exercise of reasonable diligence, have discovered Vigilant's secret plan and intention or the falsity of Vigilant's representations.

86.     In reliance on Vigilant's representations and promises, Another Planet purchased the Policy and did not purchase alternative coverage that was available in the marketplace at that time that would have provided the coverage that Vigilant promised to provide.  Had Vigilant not misrepresented the coverage it was selling, Another Planet would not have purchased the Policy and would have purchased insurance elsewhere or would have purchased the Policy with different premiums, terms, and conditions.  Another Planet justifiably relied on Vigilant's representations based on, among other things, Vigilant's superior knowledge and expertise about insurance, the express representations in the Policy, Vigilant's representations that the Policy was an "all risk" Policy, and Chubb's reputation and public statements about how it treats its insureds.

COMPLAINT AND DEMAND FOR JURY TRIAL

87.    Vigilant failed to abide by its representations and promises and, contrary to those representations and promises, refused to provide the coverage it promised to provide.

88.    As a direct and proximate result of Vigilant's acts, Another Planet has sustained, and continues to sustain, damages in an amount in excess of this Court's jurisdictional limits, plus interest, for which Vigilant is liable, including the premiums it paid to Vigilant.  The amount of Another Planet's damages is not yet precisely known but will be established according to proof.  Another Planet will seek leave to amend this Complaint to more precisely allege the amount of its damages when the amount is more precisely known.

89.    Vigilant's conduct constitutes oppression, fraud, and/or malice. Vigilant engaged in a series of acts designed to deny the benefits due under the Policy that Vigilant promised and represented, and to conceal and/or mispresent material facts.

90.    Another Planet is informed and believes, and on that basis alleges, that Vigilant—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of Vigilant's business—performed, authorized, and/or ratified the fraudulent conduct alleged above.

91.    Vigilant's conduct is despicable and has been done with a conscious disregard of the rights of Another Planet, constituting oppression, fraud, or malice. Vigilant engaged in a series of acts designed to deny Another Planet the benefits due under the Policy.  Specifically, Vigilant, by acting as alleged above, consciously disregarded Another Planet's respective rights and forced Another Planet to incur substantial financial losses, thereby inflicting substantial financial damage on Another Planet.  Vigilant ignored Another Planet's interests and concerns with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, Another Planet is entitled to recover punitive damages from Vigilant in

30

1    an amount sufficient to punish and make an example of Vigilant and to deter similar

2    conduct in the future.

3                          **FOURTH CAUSE OF ACTION**

4                   *Fraud - Promise Made without Intent to Perform*

5          92.    Another Planet realleges and incorporates by reference herein each

6    allegation contained in 1 through 66, 68, 71 through 75, and 80 through 87 above.

7          93.    In selling the Policy, Vigilant expressly and impliedly represented to

8    Another Planet that the Policy would be applied as written and would cover all

9    forms of physical loss or damage unless the cause of the loss was excluded.  At no

10   time during the discussions leading to Another Planet's purchase of the Policy did

11   any representative of Vigilant ever disclose that despite the representations in the

12   Policy, Vigilant believed and would contend that it had no obligation to cover losses

13   caused by a virus or pandemic.

14         94.    Another Planet is informed and believes, and on that basis alleges, that

15   at the time that Vigilant made its promises and representations, the promises and

16   representations were false.

17         95.    Another Planet is informed and believes, and on that basis alleges, that

18   at the time that Vigilant made these promises and representations, Vigilant did not

19   intend to honor its representations or perform these promises and intended not to

20   cover losses caused by a virus or pandemic.

21         96.    As a direct and proximate result of Vigilant's acts, Another Planet has

22   sustained, and continues to sustain, damages in an amount in excess of this Court's

23   jurisdictional limits, plus interest, for which Vigilant is liable, including the

24   premiums it paid to Vigilant.  The amount of Another Planet's damages is not yet

25   precisely known but will be established according to proof.  Another Planet will

26   seek leave to amend this Complaint to more precisely allege the amount of its

27   damages when the amount is more precisely known.

28

97.     Vigilant's conduct constitutes oppression, fraud, and/or malice. Vigilant engaged in a series of acts designed to deny the benefits due under the Policy that Vigilant promised and represented, and to conceal and/or mispresent material facts.

98.     Another Planet is informed and believes, and on that basis alleges, that Vigilant—acting through one or more of its officers, directors, or other corporate employees with substantial independent and discretionary authority over significant aspects of Vigilant's business—performed, authorized, and/or ratified the fraudulent conduct alleged above.

99.     Vigilant's conduct is despicable and has been done with a conscious disregard of the rights of Another Planet, constituting oppression, fraud, or malice. Vigilant engaged in a series of acts designed to deny Another Planet the benefits due under the Policy.  Specifically, Vigilant, by acting as alleged above, consciously disregarded Another Planet's respective rights and forced Another Planet to incur substantial financial losses, thereby inflicting substantial financial damage on Another Planet.  Vigilant ignored Another Planet's interests and concerns with the requisite intent to injure within the meaning of California Civil Code section 3294. Therefore, Another Planet is entitled to recover punitive damages from Vigilant in an amount sufficient to punish and make an example of Vigilant and to deter similar conduct in the future.

## FIFTH CAUSE OF ACTION

### *Fraud by Concealment*

100.    Another Planet realleges and incorporates by reference paragraphs 1 through 1 through 66, 68, 71 through 75, 80 through 87, and 93 through 95 above.

101.    Another Planet is informed and believes, and on that basis alleges, that if Vigilant's statements made since the outbreak of the pandemic that its policies do not cover losses from a virus or pandemic are true, Vigilant planned and intended,

1  before selling the Policy, not to cover such losses and concealed its plans and intent
2  from Another Planet.

3      102.   A limitation on coverage, such as one relating to viruses and
4  pandemics, is material to the Policy.

5      103.   Vigilant had a duty to disclose all limitations on coverage to Another
6  Planet prior to selling the Policy.

7      104.   Another Planet is informed and believes, and on that basis alleges, that
8  Vigilant knew of the availability of a "virus or bacteria" exclusion since 2006.
9  Vigilant knew it could be liable for losses from viruses and pandemics it if did not
10  include an appropriate exclusion in its policies, but Vigilant did not include such an
11  exclusion.

12      105.   Another Planet is informed and believes, and on that basis alleges, that
13  when Vigilant sold the Policy to Another Planet, Vigilant knew that Another Planet
14  did not know Vigilant's plan and intent not to pay under the Policy for any losses
15  that might arise from viruses and pandemics and concealed its plan and intent from
16  Another Planet.

17      106.   At the time Another Planet purchased the Policy, it was unaware of any
18  limitation on coverage concerning or related to damage or loss caused by a virus or
19  pandemic.

20      107.   As a direct and proximate result of Vigilant's acts, Another Planet has
21  sustained, and continues to sustain, damages in an amount in excess of this Court's
22  jurisdictional limits, plus interest, for which Vigilant is liable, including the
23  premiums it paid to Vigilant. The amount of Another Planet's damages is not yet
24  precisely known but will be established according to proof.  Another Planet will
25  seek leave to amend this Complaint to more precisely allege the amount of its
26  damages when the amount is more precisely known.

27      108.   Vigilant's conduct constitutes oppression, fraud, and/or malice.
28  Vigilant engaged in a series of acts designed to deny the benefits due under the

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

1    Policy that Vigilant promised and represented, and to conceal and/or mispresent

2    material facts.

3        109.   Another Planet is informed and believes, and on that basis alleges, that

4    Vigilant—acting through one or more of its officers, directors, or other corporate

5    employees with substantial independent and discretionary authority over significant

6    aspects of Vigilant's business—performed, authorized, and/or ratified the fraudulent

7    conduct alleged above.

8        110.   Vigilant's conduct is despicable and has been done with a conscious

9    disregard of the rights of Another Planet, constituting oppression, fraud, or malice.

10   Vigilant engaged in a series of acts designed to deny Another Planet the benefits due

11   under the Policy.  Specifically, Vigilant, by acting as alleged above, consciously

12   disregarded Another Planet's respective rights and forced Another Planet to incur

13   substantial financial losses, thereby inflicting substantial financial damage on

14   Another Planet.  Vigilant ignored Another Planet's interests and concerns with the

15   requisite intent to injure within the meaning of California Civil Code section 3294.

16   Therefore, Another Planet is entitled to recover punitive damages from Vigilant in

17   an amount sufficient to punish and make an example of Vigilant and to deter similar

18   conduct in the future

## SIXTH CAUSE OF ACTION

### *Negligent Misrepresentation*

21       111.   Another Planet realleges and incorporates by reference herein each

22   allegation contained in 1 through 66, 68, 71 through 75, 80 through 87, 93 through

23   95, and 101 through 106 above.

24       112.   Another Planet is informed and believes, and on that basis alleges, that

25   at the time that Vigilant made the promises and representations about the Policy,

26   Vigilant made them without any reasonable basis to believe they were true and with

27   the intent and knowledge that Another Planet would rely upon them.

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**

PASICH

113.   If Vigilant's current position that it has no obligation to cover Another Planet's losses is correct, then the representations Vigilant made in selling the Policy were, in fact, false, and were made without any reasonable basis for believing them to be true.  If Vigilant's current position is to be believed, then Vigilant did not plan or intend to insure losses associated with viruses or pandemics and, in fact, planned and intended the contrary.

114.   As a direct and proximate result of Vigilant's acts, Another Planet has sustained, and continues to sustain, damages in an amount in excess of this Court's jurisdictional limits, plus interest, for which Vigilant is liable, including the premiums it paid to Vigilant. The amount of Another Planet's damages is not yet precisely known but will be established according to proof.  Another Planet will seek leave to amend this Complaint to more precisely allege the amount of its damages when the amount is more precisely known.

## SEVENTH CAUSE OF ACTION

### *For Declaratory Relief*

115.   Another Planet realleges and incorporates by reference paragraphs 1 through 66 above.

116.   Another Planet contends that it is entitled to coverage under the Policy for Business Income losses suffered and/or Extra Expense incurred as a result of the presence of SARS-CoV-2 and the related Closure Orders.  Another Planet is informed and believes, and on that basis alleges, that Vigilant disputes that Another Planet is entitled to such coverage.  Therefore, an actual and justiciable controversy exists between Another Planet, on the one hand, and Vigilant, on the other.

117.   Pursuant to 28 U.S.C. § 2201, Another Planet seeks a judicial declaration from this Court confirming that Another Planet's contentions, as stated above, are correct.  A declaration is necessary in order that the parties' dispute may be resolved and that they may be aware of their respective rights and duties.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

## **PRAYER FOR RELIEF**

WHEREFORE, Another Planet prays for relief as follows:

### **ON THE FIRST CAUSE OF ACTION**

1.     For damages according to proof at the time of trial, plus interest;

### **ON THE SECOND CAUSE OF ACTION**

2.     For damages according to proof at the time of trial, including reasonable attorneys' fees incurred in obtaining the benefits due under the Policy, plus interest; and

3.     For punitive damages in an amount to be determined at the time of trial;

### **ON THE THIRD CAUSE OF ACTION**

4.     For damages, plus interest, according to proof at the time of trial;

5.     For punitive damages in an amount to be determined at the time of trial;

### **ON THE FOURTH CAUSE OF ACTION**

6.     For damages, plus interest, according to proof at the time of trial;

7.     For punitive damages in an amount to be determined at the time of trial;

### **ON THE FIFTH CAUSE OF ACTION**

8.     For damages, plus interest, according to proof at the time of trial;

9.     For punitive damages in an amount to be determined at the time of trial;

### **ON THE SIXTH CAUSE OF ACTION**

10.     For damages, plus interest, according to proof at the time of trial;

### **ON THE SEVENTH CAUSE OF ACTION**

11.     For declarations in accord with Another Planet's contentions stated above;

### **ON ALL CAUSES OF ACTION**

12.     For the costs of this lawsuit; and

1    13.    For such other, further, and/or different relief as the Court may deem

2   just and proper.

3   DATED: October 23, 2020                    PASICH LLP

4

5                                        By:  _____/s/Anamay M. Carmel_____

                                              Anamay M. Carmel

6                                             Attorneys for Plaintiff

**COMPLAINT AND DEMAND FOR JURY TRIAL**

1

### DEMAND FOR JURY TRIAL

2

3        Plaintiff Another Planet Entertainment, LLC hereby demands a trial by jury in

4  this action.

5  DATED:  October 23, 2020              PASICH LLP

6

                                   By:    /s/Anamay M. Carmel
7                                         Anamay M. Carmel

8                                         Attorneys for Plaintiff

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT AND DEMAND FOR JURY TRIAL**